UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

THOMAS MARTIN BISMARK,

               Plaintiff,

vs.                      Case No.  2:02-cv-556-FtM-29SPC

DR. R.D. LANG, DR. DAMEFF, DR.
SALOPEK, MR. REHFELDT, WEXFORD HEATH
SOURCES, INC., MR. R. O'CONNOR,
CAPTAIN REED, M.D. KING, MICHAEL W.
MOORE, and JAMES MCDONOUGH,
SECRETARY FLORIDA DEPARTMENT OF
CORRECTIONS[1],

               Defendants.

_____

**OPINION AND ORDER**

    This matter came before the Court on March 20-23, 2006, for a bench trial between plaintiff and James McDonough, the current Secretary of the Florida Department of Corrections, sued in his official capacity.  For the reasons set forth below, the Court finds in favor of plaintiff as to the sole remaining issue of plaintiff's medical need for special shoes.

    Plaintiff Thomas M. Bismark (plaintiff or Bismark), proceeding *pro se,* filed a two count civil rights complaint pursuant to 42 U.S.C. §1983 (Doc. #1) alleging violations of his Eighth Amendment

---

[1] Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, James McDonough, the current Secretary of the Florida Department of Correction, is substituted as the proper party Respondent for Michael W. Moore in his official capacity only.

rights because of the denial of proper medical and psychological care while he was incarcerated at DeSoto Correctional Institution ("DeSoto C.I."). Count I alleges that certain defendants failed to provide plaintiff with prescribed special orthopedic shoes necessitated by plaintiff's foot deformities (hammer toes and high arches). The individual defendants were employed by Wexford Health Source, Inc., which provided medical care to inmates pursuant to a contract with the State of Florida. Plaintiff's Exhibit 35. Count II alleges that plaintiff suffers from agoraphobia, which requires that he not be housed in open bay housing, and that certain defendants failed to provide plaintiff with his needed two-man cell.

The case against some defendants was resolved before trial, and was resolved as to other defendants after plaintiff rested his case in a jury trial.[2] This left Secretary McDonough as the only remaining defendant. At the conclusion of plaintiff's case against Secretary McDonough (heard by the Court concurrently with the jury trial for other defendants), the Court granted McDonough's motion for judgment as a matter of law (Doc. #216) under Fed. R. Civ. P. 52(c) as to Count II regarding plaintiff's agoraphobia claim. The

---

[2]The Court entered an Order(Doc. #62) on March 30, 2004, dismissing defendants Reed, O'Connor, and King pursuant to a motion to dismiss, and dismissing the claims for money damages against then-Secretary James Crosby. At the conclusion of plaintiff's case to the jury, the Court granted a judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) as to the individual defendants Lang, Dameff, Salopek, and Rehfeldt. Defendant Wexford Health Source, Inc. then settled the case as to itself and these individual defendants, and an agreed dismissal with prejudice (Doc. #215) was entered on March 22, 2006.

only remaining claim relates to plaintiff's request for injunctive relief in Count I relating to his need for special shoes.  This Opinion and Order resolves that claim.

## I.

Much of the evidence is undisputed, and is derived from both the testimony and the Department of Correction's ("Department or D.O.C.") records concerning plaintiff's imprisonment.  The Court admitted extensive records and testimony concerning plaintiff and his medical conditions, and this evidence both pre-dates and post-dates the pertinent time period of plaintiff's incarceration at DeSoto C.I.  While the Court finds this evidence relevant and helpful, it is important not to lose sight of the fact that the specific claim in this case involves plaintiff's time in the DeSoto Correctional Institution between March 18, 2002 and January 20, 2003.  The Court, based upon the evidence presented which it found credible, makes the following findings of fact:

**A.   First Commitment Period[3]:**

Plaintiff was received by the D.O.C. as a new commitment on May 23, 1991.  Plaintiff spent a short period in the Central Florida Reception Center, where he was given arch supports and ultimately assigned to another institution.  Plaintiff's Exhibit 2C.

---

[3]Plaintiff testified that he has nine felony convictions and has served time within the D.O.C. on three different occasions.  The details of the convictions are not relevant to the issues before the Court.

-3-

Plaintiff was transferred to the Walton Correctional Institution (Walton C.I.) on June 18, 1991, and was received there the next day. Plaintiff's Exhibit 2C. A June 19, 1991 Health Services Screening Form noted that plaintiff reported "bad feet-deformities from birth." Plaintiff's Exhibit 1B. On August 22, 1991, plaintiff went to the medical clinic and requested a doctor's appointment to evaluate his feet so he could get a tennis shoes pass. Plaintiff told the nurse that his assigned job called for wearing brogans[4], but he could not wear brogans due to previous injury to his feet, particularly his left foot. A medical evaluation was scheduled for the next week. Plaintiff's Exhibit 1D.

On August 29, 1991, plaintiff was examined by Dr. James Sheppard, the Chief Health Officer[5] at Walton C.I., who found deformities and callouses on plaintiff's fifth toes, diagnosed hammer toes, and issued an indefinite soft shoe pass (i.e., tennis shoes). Plaintiff's Exhibit 1D. Plaintiff was given D.O.C.-issued tennis shoes.

On October 3, 1991, a medical note reported that plaintiff had a permanent soft shoe pass and personal $150 tennis shoes. Plaintiff told medical personnel that he had been assigned to an

---

[4]Brogans are a boot-style shoe issued by the D.O.C., and must be worn by inmates unless a pass is issued to the contrary.

[5]The Chief Health Officer is the designated health authority with whom final clinical judgment rests on medical issues concerning inmates at assigned institutions. Plaintiff's Exhibit 39.

outside grounds work detail, which he asserted would make his feet
hurt because of his hammer toes and would make his right ankle
swell.  Plaintiff said he would not wear his personal expensive
shoes outside, and that the D.O.C.-issued tennis shoes had no arch
support.  Plaintiff therefore requested a job change.  Dr. Sheppard
denied the request for a job change, but issued a pair of soft arch
supports for plaintiff to wear in his D.O.C.-issued tennis shoes.
Dr. Sheppard wrote that he found no justification for a job change
at the time, but would give plaintiff the benefit of the doubt and
schedule an appointment for another opinion.  Plaintiff's Exhibits
1E, 1F.

On October 8, 1991, plaintiff again requested a job change
because of his feet.  Dr. Sheppard noted, contrary to his August
29, 1991 diagnosis, that plaintiff's feet revealed "no deformities
of significance," found plaintiff had normal feet, and again denied
the request for a job change.  Plaintiff's Exhibit 1H.

On November 19, 1991, plaintiff reported to the medical clinic
complaining of pain in his left foot so bad that he could not
stand.  A large callous was noted on plaintiff's left foot and
heel, which was red and inflamed.  Plaintiff was issued corn pads
and a lay-in pass for 72 hours, and a follow-up appointment was
scheduled.  The December 2, 1991 follow-up appointment continued to
note tender callouses.  Plaintiff's Exhibit 1I.

Plaintiff then filed the first of many grievances about the
care given his feet. Plaintiff requested either special order shoes

or a consultation with an orthopaedic specialist.  The Health Service Administrator[6] reviewed the matter on February 18, 1992, noting that plaintiff's request for special shoes had previously been denied in accordance with TSB [Technical Service Bulletin] #15.02.06.  Plaintiff's requests were denied based on the medical record.  Plaintiff's Exhibit 2B.

On February 19, 1992, plaintiff reported to the medical clinic requesting a two-day lay-in pass because his right leg hurt. Although nothing specific was noted, a pass was issued and a doctor's appointment was moved up.  Plaintiff's Exhibit 2B.  The doctor's evaluation of February 24, 1992 noted the foot deformities of hammer toes, and referred plaintiff for a consultative examination.  Plaintiff's Exhibits 2B, 2C.  Plaintiff had an x-ray of his right knee on February 26, 1992.  Plaintiff's Exhibit 2C.

On February 26, 1992, plaintiff filed an informal grievance concerning his medical care.  After reviewing the medical record, the informal grievance was denied.  Plaintiff's Exhibits 2C, 2D. On February 27, 1992, an orthopaedic evaluation appointment was scheduled for March 25, 1992, by a doctor in another facility. Plaintiff's Exhibit 2D.

On March 17, 1992, plaintiff was transferred to Apalachee Correctional Institution West to be seen by the orthopedic

---

[6]The Health Service Administrator is the department or health service contract employee responsible to the chief health officer for administrative processes within the health services unit at an institution and any of its facilities. Plaintiff's Exhibit 39.

specialist.  The March 25, 1992, report of Dr. Steven P. Surgnier stated that plaintiff was born with "rather severe cleft foot deformities that were treated surgically and conservatively."  Dr. Surgnier's examination of plaintiff's feet showed "mild forefoot varus and cavus positioning with some hammer toes mainly of the fourth and fifth toes."  Dr. Surgnier stated that "[i]n regards to his feet, he does need to continue with his high top tennis shoes and some custom molded arch supports and shoe inserts would be appropriate."  Plaintiff's Exhibit 2F.  On April 3, 1992, plaintiff was seen by Dr. Shou-Huel Wu, who issued a pass for high top tennis shoes.  Dr. Wu noted that no surgical intervention was needed at the present; and, stated that plaintiff could be transferred back to his original institution.  Plaintiff's Exhibit 2H.

Instead, plaintiff was transferred to Calhoun Correctional Institution (Calhoun C. I.) on April 20, 1992.  On April 28, 1992, plaintiff filed an informal grievance, and was seen by Dr. Fariss Kimbell, Jr. on April 29, 1992.  Dr. Kimbell took x-rays of plaintiff's ankles and feet, which showed normal examination of both feet and ankles.  Dr. Kimbell, nonetheless, issued plaintiff a pass to wear high top tennis shoes "only because you had previously been given a similar pass by Dr. Surgnier on 3/25/92."  Dr. Kimbell scheduled an examination by a podiatrist concerning whether plaintiff should be allowed to continue to wear high top tennis shoes.  In the meantime, a pass was issued giving plaintiff

permission to wear high top tennis shoes.  Plaintiff's Exhibit 2L.
The informal grievance was denied.  Plaintiff's Exhibit 2J.

On April 29, 1992, plaintiff went to the medical department to
pick up a pair of high top tennis shoes, but was told that Dr.
Kimbell had already told him that he would have to wear his
personal shoes.  Plaintiff said he had high top shoes but was
sending his home.  Plaintiff's Exhibit 2K.

Plaintiff filed an informal grievance on May 6, 1992,
asserting that he needed to be supplied with a pair of high top
tennis shoes as ordered by Dr. Surgnier on March 25, 1992.  This
was denied pending the consultative examination by a podiatrist.
Plaintiff's Exhibit 2L.

On June 8, 1992, plaintiff was seen by a podiatrist
consultant, Dr. Merritt.  Dr. Merritt recommended high top shoes.
Plaintiff's Exhibits 2M, 2I.

On June 17, 1992, Dr. Albert R. Folds, Chief Health Officer at
Calhoun C.I., discussed the feet problems and the consultant's
report with plaintiff.  Plaintiff was found to have high arches on
both feet, and plaintiff was to be sent to Williams Orthotics for
an orthotic consultation on shoes.  Plaintiff's Exhibit 2N.
Williams Orthotics recommended that plaintiff be casted for
bilateral custom orthotics, and noted that plaintiff would benefit
from a pair of high top brogans in conjunction with the orthotics.
Dr. Folds discussed this with plaintiff, who said that Dr. Merritt
had specified tennis shoes and that orthotics would work with

-8-

tennis shoes.  Plaintiff stated his belief that his toes and excessively high arches would not accommodate brogans, which Dr. Folds noted was possible and that the stiffness and distance of brogans may pose a problem.  Plaintiff's Exhibit 2O.

On July 7, 1992, a Williams Orthotics representative (Dale) called the Calhoun C.I. medical secretary and stated that plaintiff did need inserts, and that the inserts would work in brogans.  Dale would make the cast of plaintiff foot, and wait for the shoes to be sent to him.  Dale then called a second time, reporting that plaintiff stated that Drs. Kimball and Merritt said he needed high top soft shoes.  Dale said an inexpensive type of high top shoe would work with the orthotics.  Plaintiff's Exhibit 2P.  On July 24, 1992, Dr. Folds entered a note ordering orthotic shoes for plaintiff.  Plaintiff's Exhibits 2Q.  On July 28, 1992, plaintiff was given special shoes, of which he approved, to be sent to Williams Orthotics for the inserts.  Plaintiff's Exhibit 2R.  On August 7, 1992, plaintiff was given a pair of black high-top tennis shoes with bilateral custom orthotics.  Plaintiff's Exhibit 2S. Plaintiff was released from custody on October 20, 1992.

## B.  Second Commitment Period:

Plaintiff entered the Florida penal system for a second time on May 19, 1995.  Plaintiff was admitted to the Central Florida Reception Center, where he stayed until August 14, 1995, when he transferred to Hendry Correctional Institution (Hendry C.I.).  On August 16, 1995, a medical evaluation was scheduled because of

plaintiff's foot deformities.  Plaintiff's Exhibit 4A.  On August 28, 1995, plaintiff was examined by a nurse and found to have foot deformities.  The nurse also ordered plaintiff's prior medical records from his earlier period of incarceration.  Plaintiff's Exhibit 4B.

On September 12, 1995, plaintiff reported to the medical clinic that he had high arches bilaterally and wore orthotics, but that these were taken from him at the Central Florida Reception Center because they were not prison issued.  The nurse again noted the need to obtain plaintiff's prior medical records as soon as possible; noted that plaintiff should not stand for more than twenty minutes; and, advised that plaintiff should not wear brogans, but could wear high-top soft shoes.  Plaintiff's Exhibit 4C.

On September 19, 1995, plaintiff reported bilateral pain because he was supposed to wear orthopedic shoes.  The nurse noted that the shoe problem was being addressed by the physician awaiting plaintiff's prior medical records from the reception centers. Plaintiff's Exhibit 4D.

On September 22, 1995, plaintiff was seen by Dr. Ricardo Tirado Montes for an evaluation concerning orthopedic shoes.  Dr. Montes noted there was no documentation in the file of any type of foot deformity, only a mention of high arches.  His examination revealed that both feet had high arches and callouses under the big

-10-

toes and heels.  Dr. Montes prescribed high-top soft shoes with arch supports.  Plaintiff's Exhibit 4D.

On September 27, 1995, Dr. C.M. Lajara made a medical note that the prison record documented that plaintiff had high arches, but that plaintiff did not meet the D.O.C.'s policy for special shoes.  Plaintiff's Exhibit 4E.  When informed of this, plaintiff became angry and threatened a lawsuit.  Plaintiff's Exhibit 4E. Plaintiff filed an informal grievance on October 10, 1995, seeking special high-top tennis shoes.  Based upon the September 22, 1995 evaluation, this grievance was denied by Dr. Lajara.

On October 27, 1995, plaintiff filed another informal grievance for orthopedic shoes, warning that he would file a lawsuit.  Dr. Lajara again found no condition warranting special shoes, and denied the grievance.  Plaintiff's Exhibit 4F.

On November 7, 1995, plaintiff filed another informal grievance for orthopedic shoes.  Dr. Lajara found the previous grievance had been answered adequately, and denied the grievance. Plaintiff's Exhibit 4F.

On December 8, 1995, plaintiff filed another informal grievance for orthopedic shoes.  Dr. Lajara again found no condition warranting special shoes, and denied the grievance. Plaintiff's Exhibit 4G.

On December 14, 1995, plaintiff declared a medical emergency for deformed and high arch feet, resulting in pain from his feet to

his ass.   An examination by a nurse found no medical emergency. Plaintiff's Exhibit 4G.

On April 22, 1996, plaintiff was transferred to the Charlotte Correctional Institution (Charlotte C.I).   Plaintiff's sentence expired on December 24, 1996 and he was released from custody.

**C.   Third Commitment Period:**

**(1) Central Florida Reception Center:**

Plaintiff entered the Florida penal system for the third time on January 8, 1998.   Plaintiff was admitted through the Central Florida Reception Center, and had an initial physical examination on January 14, 1998 by Dr. Segundo Delumpa.   Dr. Delumpa noted that the shoes plaintiff had were not approved, and issued a pass for new brogans.   Plaintiff's Exhibits 5A, 5B.   On January 30, 1998, the Central Florida Reception Center received plaintiff's old medical file.   Defendant's Exhibit 1.[7]

On February 11, 1998, plaintiff complained of constant pain to both feet due to the shoes he was wearing.   An examination revealed soft swelling to superior/lateral feet, callous to superior 5th toes on both feet, both 5th toes with an arc appearance; plaintiff walked with a stable gait, and could move both feet with full range of motion.   The assessment was unspecified joint pain and feet pain with callouses to 5th toes superiorly.   Plaintiff was referred to

---

[7]In addition to specific exhibits presented by plaintiff, defendant has introduced as a composite exhibit plaintiff's entire medical file during his current incarceration.   Defendant's Exhibit 1.   These records are in chronological order.

a doctor, given a two day lay-in pass, told to elevate his feet as much as possible when not in the dorm, and use moist heat on his feet.  Plaintiff's Exhibit 5B.

On February 12, 1998, plaintiff reported to sick call with complaints that his feet were swelling and in pain.  Dr. Delumpa observed that plaintiff had high arches, calluses on the bottom of his feet, mild hammer toe deformity of the left 5th toe, mild tenderness plantar fascia of both feet, good dorsalis pedis and posterior tibialis, and that plaintiff walked with his brogans on without difficulty.  Dr. Delumpa's assessment was fasciitis and high arches on both feet, and mild hammer toe deformity of the left 5th toe.  Dr. Delumpa prescribed an arch support, ordered an x-ray of both feet, and scheduled a follow-up appointment.  Plaintiff's Exhibits 5C, 5D.

At the February 27, 1998 follow-up appointment, plaintiff said his feet still hurt, even with the arch support.  Dr. Delumpa's assessment was fasciitis and high arch feet that did not respond well to the arch support.  Dr. Delumpa authorized a podiatry consultation and changed plaintiff's medication.  Plaintiff's Exhibit 5C.

The consultation evaluation by Dr. Gerald Bornstein found extensive deformity bilaterally at the 5th digits, and on weight bearing that the 5th digits are contracted and abducted from the mid line of the foot. Dr. Bornstein recommended special shoes with inserts, and if the shoes failed to provided relief for the 5th

-13-

digits then surgical correction would be recommended.  Plaintiff's Exhibit 5E.   Plaintiff was given inserts in April, 1998, Plaintiff's Exhibit 7D, but was transferred before receiving any shoes.  Plaintiff's Exhibit 6A.

**(2) Zephyrhills Correctional Institution:**

On April 30, 1998, plaintiff was transferred to Zephyrhills Correctional Institution Crisis Stabilization Union for a non-feet related issue.

**(3) Everglades Correctional Institution:**

On May 13, 1998, plaintiff was transferred to Everglades Correctional Institution (Everglades C.I.).  Defendant's Exhibit 3. On July 7, 1998, plaintiff filed a medical grievance because he had not received the shoes prescribed earlier by Dr. Bornstein.  Dr. Neil Fisher determined that the shoes had been ordered, but apparently were lost.  Therefore plaintiff's grievance was approved for further inquiry, and plaintiff was placed on callout for evaluation concerning the matter.   Plaintiff's Exhibit 6A. Plaintiff's doctor's appointment was scheduled for September 15, 1998, but he was taken to court in Sarasota, Florida, the appointment was never made, and plaintiff never received his shoes. Plaintiff's Exhibit 6B.

While Plaintiff was in Sarasota, he remained out of D.O.C.'s custody through to May 31, 1999.  Defendant's Exhibit 3.

When plaintiff returned to Everglades C.I. on May 31, 1999,his boots and inserts were taken, and his inserts were not returned.

-14-

On June 15, 1999, plaintiff was examined by Dr. Neil Fisher after making a request for special shoes.   Dr. Fisher found that plaintiff had a minor deformity of the 5th digit, and that plaintiff while wearing state-issued boots was walking normally with no amount of difficulty.   Dr. Fisher denied plaintiff's special shoe request, advising plaintiff instead to buy sneakers at the canteen, pointing out that the medical department supplies shoes only for grossly abnormal feet.   Dr. Fisher noted that plaintiff was very angry about this, saying "I'll see you in court."   Plaintiff's Exhibit 6G.

On June 18, 1999, plaintiff filed a request to get the inserts and shoes because he was in pain due to improper footwear.   The request was denied because plaintiff had been re-evaluated by Dr. Fisher at Everglades C.I. and his request for special shoes was denied.   Plaintiff's Exhibit 6B.   Plaintiff filed an informal grievance on June 19, 1999, which was denied for the same reason stated on June 18, 1999.   Plaintiff's Exhibit 6C.

On July 13, 1999, plaintiff filed a medical grievance because he had not received the shoes prescribed by Dr. Bornstein, the podiatrist.   The response indicated that plaintiff was seen on June 15, 1999, and his current medical condition was evaluated as not requiring orthopedic shoes.   Plaintiff was instructed that if his medical condition worsened, he could sign up for sick call and be further evaluated.   The grievance was denied.   Plaintiff's Exhibit 6D.

On July 30, 1999, plaintiff was issued a two day lay-in pass due to a foot problem, and told to keep off his feet.  Plaintiff's Exhibit 6E.

On August 14, 1999, plaintiff filed a medical grievance because he had not yet received the shoes prescribed by Dr. Bornstein.   The response indicated that the prior response appropriately addressed the issues, and the grievance was denied. The response stated in part: "It is the responsibility of your Chief Health Officer to determine the appropriate treatment regimen for the condition you are experiencing.  Special shoes are ordered by your Chief Health Officer only when an inmates medical condition meets the criteria for special shoes.  Dr. Fisher determined on 6/15/99 that orthopedic shoes were not medically indicated." Plaintiff's Exhibit 6F.

**(4)  Out of D.O.C. Custody:**

Plaintiff was again out of D.O.C. custody while in Sarasota from September 30, 1999 to December 3, 1999.  Plaintiff returned to Everglades C.I. on December 3, 1999.   Defendant's Exhibit 3.

**(5)  Everglades Correctional Institution:**

In February, 2000, plaintiff filed a civil rights complaint in the United States District Court for the Southern District of Florida.[8]  On May 17, 2000, plaintiff filed a grievance for special

---

[8]Case No. 00-0686-civ-Jordan is currently pending in the Eleventh Circuit Court of Appeals on review of summary judgment in favor of defendants.

shoes, and was told to seek medical sick call for any new complaints. Defendant's Exhibit 1.

On June 6, 2000, plaintiff filed a medical grievance because he had not received the shoes prescribed by the podiatrist. The response indicated that the prior response by Dr. Naya on 5/31/00 and Emile Baudoin d' Ajoux on 9/2/99 clearly and appropriately addressed the issues, and the grievance was denied. The response stated in part: "It is the responsibility of your Chief Health Officer to determine the appropriate treatment regimen for the condition you are experiencing. Special shoes are ordered by your CHO only when an inmates medical condition meets the criteria for special shoes." Plaintiff's Exhibit 6F.

On June 7, 2000, plaintiff turned his ankle while working. On August 16, 2000, plaintiff advised the medical clinic that Dr. Fisher previously had denied him special shoes and a podiatrist consult, but explained that now that Dr. Fisher had left the institution he needed to try again because his feet hurt all the time. The nurse referred him to a doctor, who on August 25, 2000 referred plaintiff for x-rays and a podiatrist consultation. Defendant's Exhibit 1. A September 5, 2000, radiology report found "On the lateral, there is dorsal subluxation of the proximal phalanges with respect to the metatarsals, consistent with the diagnosis [history of hammer toes]. No other abnormality is identified." Plaintiff's Exhibit 6I. A medical clinic examination on September 26, 2000 noted plaintiff's complaint of hammer toes

and advised of a podiatrist examination when possible.  Plaintiff's Exhibit 6J.  In November, 2000, the medical staff again requested a podiatry consultation.  Defendant's Exhibit 1.  On November 28, 2000, Dr. Jose Valiente examined plaintiff, and assessed a need for orthopedic shoes.  Defendant's Exhibit 1.

On December 12, 2000, Dr. J. Oderinde examined plaintiff and found bilateral hammer toes, corns, and high arches.  Dr. Oderinde prescribed shoes with a wide toe box and a consultation with a podiatrist.  Plaintiff's Exhibit 6K.  Plaintiff then was sent for an outside consultation, and a consultative report dated December 28, 2000 found that plaintiff had high arches and hammer toes, and stated that plaintiff needed supports for both feet and high-top New Balance shoes in which to use the supports.  Plaintiff's Exhibit 6M.  Staff physician Dr. Jose Valiente issued a pass for orthopedic shoes from December 27, 2000 until December 25, 2001.  Plaintiff's Exhibit 6N.  Plaintiff returned to Everglades C.I. from the orthopedic consultation on January 5, 2001.  On January 5, 2001, the consultant wrote that shoes supplied by Everglades C.I. were "ok" and he would now make the supports. Plaintiff's Exhibit 6O.  Plaintiff received the shoes in late January, 2001.  Defendant's Exhibit 1; Plaintiff's Exhibit 7B.

Plaintiff's medical file reflects no further complaints about his feet for the rest of 2001.  Plaintiff was told his pass to wear orthopedic shoes should be renewed, Defendant's Exhibit 1, and the

pass was renewed from December 27, 2001 to December 27, 2002. Plaintiff's Exhibit 6R.

On January 28, 2002, while still incarcerated at Everglades C.I., plaintiff requested new sneakers.  Defendant's Exhibit 1. Plaintiff was examined by a consultant who reported that the insoles/supports were still good, but that plaintiff needed new sneakers.  He recommended New Balance 754.  Plaintiff's Exhibit 6P.

Plaintiff did not receive the new shoes, and on February 23, 2002, he filed a grievance stating that in February, 2001 he was issued orthopedic shoes; in January, 2002 an outside specialist prescribed new shoes; and the old shoes had not yet been replaced. The grievance was approved on March 5, 2002, stating that "[d]ue to your medical condition you will be provided with soft-shoes." Plaintiff's Exhibit 6Q.

**(6) DeSoto Correctional Institution:**

On March 15, 2002, plaintiff was transferred to DeSoto Correctional Institution (DeSoto C.I.).  Defendant's Exhibit 3.  A Health Information Transfer Summary dated March 15, 2002, under "Passes" stated that plaintiff "may wear orthopedic shoes." Defendant's Exhibit 1.  On March 18, 2002, plaintiff arrived at DeSoto C.I., and told staff members that he needed replacement orthopedic shoes.  Plaintiff's medical records were received by DeSoto C.I. on March 18, 2002.  Defendant's Exhibit 1.

On March 26, 2002, plaintiff filed a request inquiring about the New Balance shoes, which he had not received before his

transfer from Everglades C.I.  The response directed plaintiff to discuss the matter with health care staff, who would evaluate plaintiff to determine whether he required special shoes. Plaintiff's Exhibit 17.

On April 4, 2002, plaintiff was examined by Dr. Robert Lang, who observed mild hammer toes, found there was no current need for special shoes, and issued a double sock pass.  Defendant's Exhibit 1.  Plaintiff testified that Dr. Lang told him that he did not meet D.O.C. criteria, and he, Dr. Lang, did not care what other doctors had done.  On April 9, 2002, plaintiff filed a grievance based upon the denial of special shoes by Dr. Lang.  The April 24, 2002 response stated that plaintiff did not meet D.O.C. criteria for special shoes.  Plaintiff's Exhibits 20, 20A.  A medical note indicated that the special shoe criteria was contained in TI [Technical Instruction] 15.02.06.  Defendant's Exhibit 1.

Technical Instruction No. 15.02.06, (Plaintiff's Exhibit 44) in effect from March 15, 2000 to April 11, 2003, discusses "special shoes."  In order to issue special shoes, the physician had to determine which medical criteria was applicable and document such criteria with the order for special shoes.  The criteria for special shoes were: (1) postsurgery recuperation; (2) significant deformities; (3) recent foot trauma recuperation; and (4) neurological problem.  If issued, an inmate would sign for the special shoes with the understanding that replacement would be the

inmate's obligation if replacement was needed less than a year after issuance, unless the shoes were worn out.

On May 2, 2002, plaintiff filed a grievance about the lack of orthopedic shoes. The response indicated that Dr. Lang's April 24, 2002 response appropriately addressed the issue. It further stated: "It is the responsibility of your Chief Health Officer to determine the appropriate treatment regimen for the condition you are experiencing. Special shoes are ordered by your Chief Health Officer only when an inmate's medical condition meets the criteria for special shoes." Plaintiff's Exhibit 23.

Effective May 3, 2002, Technical Instruction No. 15.02.16 concerning inmate medical passes was amended. Plaintiff's Exhibit 48. A medical pass was defined as "a written authorization (based on sound medical reasons) from health services to the other institutional offices that will permit an inmate certain relief from a departmental or institutional requirements which affects a special medical problem." All inmate medical passes were to be "based on genuine medical need to enhance the resolution of a temporary condition or to facilitate the care and treatment of a permanent condition." Passes were not to extend beyond 12 months, and the chief health officer was responsible for ensuring that the passes were issued for documented medical needs, and only for an appropriate length of time. When an inmate with a valid medical pass was transferred, the pass was to be honored at the receiving institution until its expiration date. However, "[a]n evaluation

to determine the continued need for a pass that was already properly authorized at the sending institution may be completed at the discretion of the clinician at the receiving institution but is not required.  Continued need for special passes may, however, be reviewed upon expiration and/or incidental to an encounter that is related to a condition which required the pass."

On June 26, 2002, plaintiff was examined by Dr. Vlatko Salopek, who diagnosed mild hammer toes at 5th toes, and denied a soft shoe pass.  Defendant's Exhibit 1.

On July 24, 2002, plaintiff was examined by Dr. Salopek. Plaintiff testified that he was informed that under D.O.C. policy an inmate did not qualify for orthopedic shoes unless he had gross deformities such as missing toes, regardless of past medical care. Plaintiff's Exhibit 24.  A medical note that day stated that plaintiff did not meet the criteria for special shoes.  Defendant's Exhibit 1.

On July 26, 2002, plaintiff filed a grievance about the lack of orthopedic shoes and the policy statements as explained by Dr. Salopek.  The August 9, 2002, response denied the grievance, indicating that plaintiff had been treated by the doctor on June 26 and July 24, 2002, and that the doctor determined plaintiff did not meet D.O.C. criteria for soft/special shoes.  Plaintiff's Exhibit 24.

On August 17, 2002, plaintiff filed an appeal of the grievance denial.  The response denied the appeal, indicating that Dr.

Salopek's August 9, 2002 response appropriately addressed the issue. It further stated: "It is the responsibility of your Chief Health Officer to determine the appropriate treatment regimen for the condition you are experiencing. Special shoes are ordered by your Chief Health Officer only when an inmate's medical condition meets the criteria for special shoes." Plaintiff's Exhibit 25.

On September 12, 2002, plaintiff was examined by Dr. Emil Dameff who found plaintiff to have very mild hammer toes, minimum deformity, slightly increased arches bilaterally, and a normal gait. Dr. Dameff wrote that plaintiff did not meet the D.O.C. criteria for special shoes; that his deformity is mild; and, both feet easily fit into brogans without any difficulty. Since plaintiff had slightly high arches, Dr. Dameff would have agreed to give plaintiff arch supports, but plaintiff already had his own arch supports. Dr. Dameff found no indication for special shoes. Defendant's Exhibit 1.

On December 5, 2002, there was an incident in which plaintiff slipped and fell, told correctional officers he had passes for special shoes, but then ate the passes before they could be examined. The medical note stated that no evidence of current passes was found in the medical record. Plaintiff refused medical treatment. Defendant's Exhibit 1. Plaintiff was transferred out of DeSoto C.I. on January 20, 2003. Defendant's Exhibit 1.

**(7) Subsequent Transfers:**

-23-

Plaintiff was received by Wackenhut Corrections Corporation, a private prison, on January 21, 2003. Defendant's Exhibit 1. Effective April 11, 2003, Technical Instruction No. 15.02.06 was amended in both form and substance. Plaintiff's Exhibit 44. This version defined "special shoes" as shoes "designed or altered to provide a therapeutic benefit or accommodation of a specific foot or lower extremity disorder." "Soft shoes" were defined as shoes that are typically tennis shoes, sneakers, running shoes, and athletic shoes. It further provided that "[s]oft shoes are not issued by medical unless the shoes are to be used with a specific orthotic device." The clinical criteria for issuance of special shoes were modified. The "significant deformities" criterion now stated that these "usually require a specially designed orthotic device that assists the patient in maintaining or approximating normal ambulation." Additionally, the amended version stated that "[b]unions, calluses, and hammer toes do not require a special shoe. Sometimes the aggravation of these conditions is due to ill fitting shoes. If it is determined that the inmate would benefit from a better fitting shoe, a pass may be issued for the inmate to obtain larger-fitting shoes from the laundry." As before, it was anticipated that the shoes would not be replaced in less than a year.

On August 1, 2003, plaintiff reported to sick call stating he needed new shoes. A nurse found plaintiff had hammer toes, with no obvious deformities and that his shoes were in fairly good shape.

The nurse referred plaintiff to a doctor.  Dr. J. Schocoff examined plaintiff on August 4, 2003, and found that plaintiff had high arches and mild hammer toes, but found no need for new shoes. Defendant's Exhibit 1.  On August 18, 2003, plaintiff filed a grievance appeal stating that he was prescribed new shoes on January 28, 2002 by an orthopedic specialist, but on September 12, 2003, he was denied issuance of the shoes by Dr. Schocoff. Defendant's Exhibit 33.  Plaintiff's appeal was denied on September 12, 2003.

On April 19, 2004, plaintiff was transferred to South Bay Correctional Facility, a privately operated prison, and issued Etonic tennis shoes on June 1, 2004.  Plaintiff's Exhibits 7C, 41.

On August 22, 2005, plaintiff was transferred to Okeechobee Correctional Institution.  Plaintiff was issued a shoe pass from September 15, 2005 through September 16, 2006, stating he "must wear orthopedic shoes."  Plaintiff's Exhibit 37.

## II.

Plaintiff alleges that the D.O.C.'s refusal to provide him with soft shoes because he did not meet its institutional policy constitutes deliberate medical indifference in violation of the Eighth Amendment.  Plaintiff also alleges that the D.O.C. policy that allows the Chief Medical Officer of each institution to set policy is unreasonable and violates the Eighth Amendment. Additionally, plaintiff challenges the gross deformity standard employed by the D.O.C. as unconstitutional and unreasonable in its

application to him.   Similarly, Plaintiff complains that the D.O.C.'s policy requiring inmates who have previously demonstrated a serious medical need at one penal institution to again demonstrate their serious medical need at each penal facility to which they are subsequently transferred is unreasonable and constitutes deliberate medical indifference in violation of the Eighth Amendment.

**A.**

Title 42 U.S.C. § 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws."  To prove a claim under 42 U.S.C. § 1983, Plaintiff must establish that (1) defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law.  Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998); U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1288 (11th Cir. 2001).   In addition, Plaintiff must establish an affirmative causal connection between the defendant's conduct and the constitutional deprivation.  Marsh v. Butler County, Ala., 268 F.3d 1014, 1059 (11th Cir. 2001)(en banc); Swint v. City of Wadley, Ala., 51 F.3d 988 (11th Cir. 1995); Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1541 n.1 (11th Cir. 1994).

A government official sued in his official capacity cannot be liable on a theory of *respondeat superior*.  Monell v. Dept. of Soc. Servs., 436 U.S. 658, 692 (1978).  To impose § 1983 liability on an

official capacity claim, plaintiff must show: (1) that his constitutional rights were violated; (2) that the entity had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). Plaintiff must identify the policy or custom that caused the injury, McDowell, 392 F.3d at 1290, and the policy or custom must have been the moving force behind the injury. Bd. of Cty. Comm. v. Brown, 520 F.3d 397, 404 (1997).

### B.

"Deliberate indifference to [the] serious medical needs of [a] prisoner [ ] constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)(quoting Estelle v. Gamble, 429 U.S. 97 (1976); Campbell v. Sikes, 169 F.3d 1353 (11th Cir. 1999). Medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991). To establish his Eighth Amendment claim, plaintiff must prove both an objective and a subjective component. Farrow, 320 F.3d at 1243. To establish an objectively serious deprivation of medical care, a prisoner must establish (1) an objectively serious medical need, and (2) that the response made to the need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely

accidental inadequacy, negligence in diagnosis or treatment, or medical malpractice. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000).

A "serious medical need" is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and, in either case, must be one that if left unattended poses a substantial risk of serious harm. Kelley v. Hicks, 400 F.3d 1282, 1284 n.3 (11th Cir. 2005); Brown, 387 F.3d at 1351; Farrow, 320 F.3d at 1243. Deliberate indifference to a prisoner's future health can constitute an Eighth Amendment violation. Kelley, 400 F.3d at 1284; Powell v. Lennon, 914 F.2d 1459, 1464 n.10 (11th Cir. 1990).

To show the required subjective intent, plaintiff must prove defendant acted with "deliberate indifference" by showing (1) subjective knowledge of a risk of serious harm (i.e., both awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists and the actual drawing of the inference); (2) disregard of that risk; and (3) by conduct that is more than gross negligence. Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005). Inadvertent, negligent, or even gross negligent failure to provide adequate medical care does not rise to a constitutional violation. Farrow, 320 F.3d at 1243. Deliberate indifference, however, may also be established by showing a decision to take an easier but less efficacious course of

-28-

treatment, or by medical care which is so cursory as to amount to no treatment at all.  McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999); Adams, 61 F.3d at 1544.

Delay of treatment for serious conditions can rise to the level of deliberate indifference where it is apparent that delay would detrimentally exacerbate the medical problem, the delay does seriously exacerbate the medical problem, and the delay is medically unjustified. Taylor, 221 F.3d at 1259-60 (citing Hill v. Dekalb Reg'l Youth Ct., 40 F.3d 1176, 1187 (11th Cir. 1994)); Lancaster, 116 F.3d at 1425.  Whether the delay was tolerable depends on the nature of the medical need and the reason for the delay.  Farrow, 320 F.3d at 1247.  A constitutional claim can exist for delayed treatment of a condition that does not require immediate attention.  Farrow, 320 F.3d at 1247.

The constitutional right to medical care may include diagnostic tests known to be necessary, not just medicinal and surgical care.  Harris v. Coweta County, 21 F.3d 388,   (11th Cir. 1994).  Plaintiff can show an Eighth Amendment violation, even if a cure is not possible, if certain treatments eliminate pain and suffering at least temporarily.  Washington v. Dugger, 860 F.3d 1018, 1021 (11th Cir. 1988).  However, where a prisoner receives adequate medical care but desires to receive a different mode of treatment, the care provided does not amount to deliberate indifference.  Hamm v. DeKalb, 774 F.2d 1567, 1575 (11th Cir. 1985).  Whether a defendant should have used additional or

different diagnostic techniques or forms of treatment "is a classic example of a matter for medical judgment and therefore not an appropriate basis for liability under the Eighth Amendment." <u>Adams v. Poag</u>, 61 F.3d 1537, 1545 (11th Cir. 1995).

### III.

For the reasons set forth below, the Court determines that defendant James McDonough, in his official capacity of the Secretary of the D.O.C., did violate plaintiff's Eighth Amendment rights.

### A.

It is clear from the evidence presented that the conduct complained of in this case occurred "under color of state law" within the meaning of § 1983.  All the challenged conduct occurred while plaintiff was incarcerated in the DeSoto C.I. under the control of the D.O.C., and the acts or omissions were committed by D.O.C. employees or employees in privity of contract with D.o.C.

### B.

The Court also finds that plaintiff has established that defendant McDonough, as Secretary of D.O.C., had policies that were the moving force behind the acts or omissions at issue in this case.  Plaintiff has clearly established through the exhibits and testimony that the acts and omissions committed by the medical staff while plaintiff was incarcerated at DeSoto C.I. were pursuant to their interpretation of the written D.O.C. policies.  The medical records and grievance responses consistently and explicitly

state that the conduct occurred pursuant to and because of such D.O.C. policies.  The existence of such policies, and the causal connection between the policies and the conduct, is well established by the evidence in this case.

### C.

Plaintiff argues that several of the D.O.C. policies are facially unconstitutional.  The Court disagrees, and finds that the D.O.C. policies which were in effect during plaintiff's incarceration in DeSoto C.I. did not facially violate the Eighth Amendment.

The Court must give deference to prison officials, and therefore employs a "reasonableness" test to determine whether a regulation infringes on a constitutional right.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348-49 (1987).  Four factors are considered in determining the reasonableness of a regulation: (1) "whether the regulation has a valid, rational connection to a legitimate governmental interest;" (2) "whether alternative means are open to inmates to exercise the asserted right;" (3) "what impact an accommodation of the right would have on guards and inmates and prison resources;" and (4) "whether there are ready alternatives to the regulation."  Overton v. Bazzetta, 539 U.S. 126, 136 (2003); Turner v. Safley, 482 U.S. 78, 89-91 (1987).

Plaintiff argues that Procedure Number 401.011, Plaintiff's Exhibit 39, which permits the Chief Medical Officer of each institution to set policy, is unreasonable and violates the Eighth

Amendment.  Plaintiff misconstrues the written policy.  Procedure Number 401.011 "establish[es] guidelines for the administration of health care delivery systems to inmates under the custody or supervision of the department."  Under the "Specific Procedures" portion of this policy, it states: "The chief health officer is responsible for the final medical judgment for all parties within the facilities to which s/he is assigned."  This policy does not allow each Chief Medical Officer to set policy for the D.O.C., but makes them responsible for the medical judgments made within their respective facility.  According to the testimony of Dr. David Cherry, the Director of Health Services, the final D.O.C. policy concerning the delivery of health care services to inmates is established by the Assistant Secretary of Health Services, not individual Chief Medical Officers.  Nothing in Procedure Number 401.011 provides otherwise.  Providing the ranking medical officer at each institution with the responsibility for medical judgments made within his or her institution is reasonable under the four factors stated above.

Plaintiff also challenges the facial constitutionality of the content of the D.O.C. standard which would justify the issuance of special shoes.  The policy in existence during plaintiff's incarceration at DeSoto C.I., Technical Instruction No. 15.02.06 (Plaintiff's Exhibit 44), provides that in order for an inmate to be issued special shoes, a physician had to determine that the inmate satisfied one of the following medical criteria: (1)

postsurgery recuperation; (2) significant deformities; (3) recent foot trauma recuperation; and (4) neurological problem.  The only criterion applicable to plaintiff was "significant deformities." The Court finds that nothing on the face of this policy would constitute a violation of the Eighth Amendment.  The policy is reasonable under the four factors discussed above; the meaning of "significant" is an as-applied issue is discussed below.

Finally, plaintiff challenges the facial constitutionality of the policy which requires an inmate who has previously demonstrated a serious medical need to re-establish such a need upon being transferred to a new institution.  Effective May 3, 2002, amended Technical Instruction No. 15.02.16 (Plaintiff's Exhibit 48) provided that a medical pass was not to extend beyond 12 months, and the chief health officer was responsible for ensuring that the passes were issued only for documented medical needs.  When an inmate with a valid medical pass was transferred, the pass was to be honored at the receiving institution until its expiration date. However, "[a]n evaluation to determine the continued need for a pass that was already properly authorized at the sending institution may be completed at the discretion of the clinician at the receiving institution but is not required.  Continued need for special passes may, however, be reviewed upon expiration and/or incidental to an encounter that is related to a condition which required the pass."  This policy essentially creates the assumption that the medical pass will be honored by the transferee facility,

but allows that facility the discretionary ability to review and evaluate the continued need for the pass in the new facility. The Court finds this reasonable under the four factor standard discussed above, and there is nothing about this written policy which would establish that it is unconstitutional on its face.

**D.**

The closer issue in this case is whether the D.O.C. policies, even though not facially unconstitutional, were applied in a fashion which constituted a violation of plaintiff's personal Eighth Amendment rights. The Court concludes that plaintiff has established a violation of his Eighth Amendment rights.

**(1)**

First, the Court finds that plaintiff has established that he has serious medical needs relating to his feet, i.e., hammer toes and high arches. While neither hammer toes nor high arches would always be considered a serious medical need, the Court finds that plaintiff has sufficiently proven that in his situation these medical conditions do constitute a serious medical need both individually and in combination.

Plaintiff's high arches have been recognized and diagnosed since literally his first commitment in 1991 to the D.O.C.'s Central Florida Reception Center. Arch supports have consistently been provided to plaintiff from the D.O.C., and plaintiff's high arches have never been seriously disputed by the D.O.C. or the Secretary. More problematic has been the hammer toes.

While neither side presented any medical testimony concerning the nature of hammer toes, the record establishes the general nature of hammer toes and that plaintiff's hammer toes constitutes a serious medical condition.  Hammer toes occurs when a toe is bent at the middle joint so the end of the toe is bent downward, in a claw-like position.  Plaintiff's Exhibit 1, June 15, 1999 entry. This condition can be treated with relatively simple measures, including shoes which are not tight, soft shoes, and shoes which provide a roomy toe box.  If left untreated, the toe can become fixed in the bent position and surgery can be required.

Dr. Sheppard, the first D.O.C. physician at plaintiff's first assigned institution, diagnosed hammer toes in August, 1991, and issued an indefinite soft shoe pass.  Virtually every physician who has examined plaintiff's feet thereafter found hammer toes, although some have characterized it as mild or very mild.  The outside specialists have consistently found hammer toes severe enough to warrant special shoes, and have noted that surgery was not then required.  The D.O.C. medical staffs have intermittently prescribed/provided plaintiff with soft shoes with arch supports during his commitments.  Indeed, plaintiff entered DeSoto C.I. on March 18, 2002, with a valid medical pass for orthopedic shoes.  At least two subsequent institutions found plaintiff needed tennis shoes/orthopedic shoes because of his hammer toes.  The Court finds that plaintiff has proven by at least a preponderance of the

evidence that his hammer toes is a serious medical condition within the meaning of the Eighth Amendment.

### (2)

The Court further finds that defendant had subjective knowledge of plaintiff's serious medical need with regard to his feet. Plaintiff had made the D.O.C. aware of his feet condition consistently and repeatedly since his first commitment in 1991. The record reflects that plaintiff entered DeSoto C.I. with a special shoe pass, specifically told officials at DeSoto C.I. of his medical needs, and filed grievances concerning the perceived inadequate medical treatment for his feet. The grievance responses recognized plaintiff's condition and his claimed medical needs, although the responses denied plaintiff's requests.

### (3)

The crux of this case revolves around whether defendant's response to Plaintiff's medical need was poor enough to constitute an unnecessary and wanton infliction of pain, or whether it was simply medical malpractice or a difference of opinion in the mode of treatment between plaintiff and defendant. The Court first examines and rejects several arguments made by the parties.

Plaintiff argues that he was consistently transferred in order for the Secretary to avoid proper care of his hammer toes. Plaintiff has established that he was transferred on multiple occasions. Some of the reasons for the transfers are apparent from the records, and were not related to the medical condition of

plaintiff's feet.  The reason for some of the transfers are not explicitly stated in the record, but the Court finds that plaintiff has not established that he was transferred to different institutions for reasons related to the medical care of his feet. Even after transfers, the D.O.C. spent time and attention addressing the care to be given plaintiff's feet.  Some of the transfers resulted in the D.O.C. seeing things plaintiff's way with regard to special shoes; some did not.  The Court finds that the D.O.C. did not transfer plaintiff in order to delay or deny treatment for his feet.

The Court also finds that plaintiff has not established that the cost of providing necessary shoes was the motivating factor in the denial of plaintiff's requests for special shoes.  The D.O.C. spent a large amount of money having plaintiff examined by outside consultants during his first and third commitment terms, and provided him with custom fitted shoes during his first commitment term.  It also appears that D.O.C. has spent large sums of money in order not to give plaintiff inexpensive high top tennis shoes with arch supports, as prescribed by some of the medical personnel.  The financial wisdom of such decisions is not before the Court, but they do not suggest that cost has been a determinative factor in the D.O.C. conduct in plaintiff's case.

The Court rejects defendant's argument that plaintiff only wants high top tennis shoes for their status symbol value.  There was no evidence at trial that high top tennis shoes are a status

symbol in Florida prisons.  Additionally, plaintiff has been requesting such shoes since 1991, in the beginning of his first commitment period.  While plaintiff does seem like a determined sort, the Court finds it unlikely that he would pursue tennis shoes so repeatedly solely as a status symbol.  More importantly, outside consultants and some D.O.C. medical staff have repeatedly supported plaintiff's position that the high top tennis shoes are a medically necessity in his situation.

The substance of the Secretary's response to plaintiff's hammer toes medical needs has been mixed.  Viewed against plaintiff's institutional medical history, however, the medical care of plaintiff's feet provided at DeSoto C.I. was markedly poor. When viewed against the pattern of the Secretary's behavior, the Court is satisfied that the Secretary violated plaintiff's Eighth Amendment rights while he was incarcerated at DeSoto C.I.

The Secretary exhibited marked reluctance during plaintiff's first commitment period to provide the soft shoes which virtually all the D.O.C. medical personnel found plaintiff needed.  In August, 1991, Dr. Sheppard, the D.O.C. Chief Health Officer at Walton C.I., diagnosed plaintiff with hammer toes and issued an indefinite soft shoe pass, although plaintiff was not immediately given tennis shoes.  In February, 1992, a D.O.C. doctor's evaluation at Walton C.I. again found plaintiff had hammer toes, and scheduled a consultative examination.  In March, 1992, plaintiff was transferred to another institution so that D.O.C.

orthopedic specialist, Dr. Surgnier, could examine him.   Dr. Surgnier found plaintiff had mild hammer toes, and determined that plaintiff needed high top tennis shoes with custom molded arch supports and shoe inserts.  D.O.C.'s Dr. Wu issued plaintiff a pass for high-top tennis shoes in April, 1992, and stated plaintiff could be transferred back to his original institution.

Instead, plaintiff was transferred to the Calhoun C.I, where Dr. Kimbell issued a high-top tennis shoe pass because Dr. Surgnier had done so, and scheduled an examination by a podiatrist.   In June, 1992, Dr. Merrit, the consultative podiatrist, recommended high top shoes.  In June, 1992, Dr. Folds, the Chief Health Officer at Calhoun C.I., caused plaintiff to be sent to Williams Orthotics for an orthotic consultation.   Williams Orthotics recommended bilateral custom orthotics and a pair of high top brogans.  When plaintiff objected to the brogans, Williams Orthotics stated that the custom othotics would work in an inexpensive pair of high top tennis shoes.  Dr. Folds ordered the shoes, and in August, 1992, one year after Dr. Sheppard issued plaintiff a soft shoe pass, plaintiff was given a pair of high top tennis shoes with bilateral custom orthotics.  Approximately three months later, plaintiff was released from prison.

Plaintiff's second commitment with the D.O.C. occurred between May 19, 1995 and December 24, 1996.  Plaintiff again requested special shoes, and given the congenital nature of his medical condition and his history during the first commitment, the

Secretary's response should have been easy.  Indeed, plaintiff won an initial hollow victory, but never received any special shoes. In September, 1995, a nurse at Hendry C.I. noted plaintiff could wear high-top soft shoes.  Also in September, 1995, Dr. Montes prescribed high-top soft shoes with arch supports.  Later in September, 1995, this was countermanded by Dr. Lajara, who determined that while plaintiff had high arches he did not meet the D.O.C. policy for special shoes.  Plaintiff filed grievances over this decision, which were denied.  Plaintiff was transferred to Charlotte C.I. on April 22, 1996 and he was released when his sentence expired on December 24, 1996.  Thus, despite the institutional knowledge from the first commitment, and the lack of any evidence that plaintiff's feet changed for the better, plaintiff never received needed special shoes in the entire 17 months he was within the Secretary's custody.

Plaintiff's third and current commitment began on January 8, 1998, and the institutional conduct contributes to a finding of deliberate indifference to plaintiff's known medical condition while at DeSoto C.I.  The Central Florida Reception Center took away the shoes plaintiff entered prison with because they were not approved, and he was issued a pass for new brogans.  Shortly thereafter, plaintiff complained of constant pain in his feet due to his shoes.  In February, 1998, Dr. Delumpa diagnosed Plaintiff with mild hammer toes and high arches, and prescribed arch supports.  When this did not relieve the pain, Dr. Delumpa

authorized a podiatry consultation.  Dr. Bornstein, the consulting podiatrist, found hammer toes and recommended special shoes with inserts, and if that failed to provide relief, then surgery.  At this point, the Secretary had actual knowledge that plaintiff's feet were essentially in the same condition as during his first commitment.  As during the first commitment, the current medical expert consultant prescribed soft shoes.

Plaintiff was given the inserts but transferred to Everglades C.I. before receiving the shoes.  In July, 1998, plaintiff filed a medical grievance because he had not received the shoes.  Plaintiff won the grievance when Dr. Fisher determined the shoes had been ordered but lost.  The Secretary's policy, however, was to deprive plaintiff of the needed shoes.

Despite approving the grievance in July, 1998, Dr. Fisher denied plaintiff's request for special shoes when plaintiff returned from Sarasota court in June, 1999 because plaintiff's medical condition did not satisfy the D.O.C. policy.  No evidence suggested that plaintiff's feet changed, only the institutional response.  Plaintiff grieved this decision on several occasions, but this time lost his requests for the shoes at Everglades C.I. In August, September, and November, 2000, medical staff at Everglades C.I. recommended plaintiff for another podiatrist consultation.  In November, 2000, plaintiff was examined by Dr. Valiente, who determined plaintiff needed orthopedic shoes.  In December, 2000, Dr. Orderinde found plaintiff had high arches and

bilateral hammer toes, and prescribed shoes with a wide toe box. An outside consultant examination in December, 2000, found plaintiff had high arches and hammer toes, and stated that plaintiff needed supports for both feet and high top tennis shoes. Dr. Valiente issue a one-year pass for the shoes on December 27, 2000, and plaintiff received the shoes in late January, 2001. Thus, approximately 30 months after Dr. Bornstein, defendant's outside consultant, prescribed special shoes, the Secretary provided the tennis shoes. Plaintiff's soft shoe pass was renewed for another year in December, 2001.

In January, 2002, plaintiff requested a new pair of tennis shoes because his current ones had worn out. Plaintiff was examined by a consultant who found he needed a new pair of sneakers. The tennis shoes were not provided, and plaintiff filed a grievance. Plaintiff won the grievance in March, 2002, and was told that because of his medical condition he would be provided with soft shoes.

Ten days later, plaintiff was transferred to DeSoto C.I., and remained there from March 18, 2002 until January 20, 2003. When transferred, plaintiff possessed a valid pass for the soft shoes. In any reasonable setting, including the always difficult prison setting, this would have ended the matter for the foreseeable future. Despite the fact that DeSoto C.I. received plaintiff's medical records, plaintiff was not given the prescribed soft shoes. Instead, he was examined by Dr. Lang, who determined plaintiff had

mild hammer toes and no current need for special shoes under FDOC criteria.  In June, 2002, Dr. Salopek also diagnosed mild hammer toes and denied a soft shoe pass.  In September, 2002, Dr. Dameff diagnosed very mild hammer toes and found plaintiff did not meet the D.O.C. criteria for special shoes.  The Secretary allowed his policy to overrule the medical judgment of every medical consultant the D.O.C. had ever retained to examine plaintiff's feet.  These were not plaintiff's doctors, but consultants chosen by the D.O.C.

Plaintiff was transferred to Wackenhut Corrections on January 21, 2003.  He was found to have mild hammer toes and denied a soft shoe pass.  The amended policy in effect after plaintiff left DeSoto C.I. sheds light on the deliberate indifference requirement. The amended version stated that "hammer toes do not require a special shoe."  This case demonstrates that hammer toes can be a serious medical condition within the meaning of the Eighth Amendment, and a soft shoe is a well-recognized method of treating this conditions.  To issue a blanket policy to the contrary, which precludes appropriate medical care, supports a finding of deliberate indifference.  Despite this policy, medical staff under contract with the D.O.C. have provided plaintiff with soft shoes. In April, 2004, plaintiff was transferred to South Bay Correctional Facility, and issued tennis shoes in June, 2004.  In August, 2005, plaintiff was transferred to Okeechobe C.I. and issued a one-year soft shoe pass in September, 2005.

This is not a case where plaintiff simply disagrees with the treatment modality of prison doctors.  All the expert consultants agreed with plaintiff, and most of the D.O.C. medical staff did as well.   While  doctors  can  disagree  with  one  another  without violating  Eighth  Amendment  rights,  the  facts  of  this  case  are overwhelmingly  in  support  of  deliberate  policy  decisions  not  to provide  needed  medical  care  which  was  known  to  have  been  prescribed by the experts.

The  Court  concludes  that  the  Secretary  in  his  official capacity  violated  plaintiff's  Eighth  Amendment  right  to  medical care  while  at  DeSoto  C.I.   The  Court  finds  that  the  Secretary  was deliberately  indifferent  to  plaintiff's  serious  medical  need  with regard  to  his  hammer  toes,  and  that  the  Secretary's  policy  was  the moving  force  behind  the  deliberate  indifference.

### IV.

The  Court  concludes  that  plaintiff  is  entitled  to  injunctive relief.   For  the  duration  of  plaintiff's  current  commitment,  the Secretary  of  the  D.O.C.,  in  his  official  capacity,  will  be  required to  provide  plaintiff  with  appropriate  high-top  soft  shoes  unless medical  evidence  reasonably  establishes  a  change  in  plaintiff's medical  condition  related  to  the  hammer  toes  or  demonstrates  a  need for  different  treatment.   Plaintiff  also  seeks  injunctive  relief  in the  nature  of  restoration  of  any  gain  time  lost  while  he  was incarcerated  at  Desoto  C.I.  due  to  disciplinary  actions  brought against  plaintiff  due  to  plaintiff's  refusal  to  wear  brogans.   It

is unclear whether any such disciplinary actions were taken at
DeSoto C.I.   In any event, to the extent that Plaintiff was
subjected to such disciplinary action, Plaintiff must avail himself
of the administrative appeal process available within the D.O.C.
for the Secretary's review and reconsideration of such disciplinary
actions in light of the Court's Opinion and Order.

ACCORDINGLY it is hereby

**ORDERED:**

1.   Judgment shall enter **in favor of plaintiff** as to Count I
of the Complaint as it relates to plaintiff's Eighth Amendment
claim concerning his hammer toes and against defendant Secretary
McDonough; and judgment shall enter **in favor of defendant** as to
Count II of the Complaint as it relates to plaintiff's Agoraphobia
claim and against plaintiff pursuant to the Court's Order (Doc.
#228).

2.   For the duration of plaintiff's current commitment, the
Secretary of the Florida Department of Corrections, in his official
capacity, will be required to provide plaintiff with appropriate
high-top soft shoes unless medical evidence reasonably establishes
a change in plaintiff's medical condition related to the hammer
toes or demonstrates a need for different treatment.

3.     The **Clerk of Court** shall terminate any pending motions and close this file.

**DONE AND ORDERED** at Fort Myers, Florida, on this __26th__ day of April, 2006.


JOHN E. STEELE
United States District Judge


SA: hmk
Copies to: All Parties of Record

-46-